IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF VIRGINIA
ALEXANDRIA DIVISION

------------------------------------------------------------------------ x
                                              )

PREGIS CORPORATION,                 )

                Plaintiff,             )

            - against -           )    No. 1:09-cv-467-GBL-IDD

JOHN J. DOLL, UNITED STATES PATENT   )
AND TRADEMARK OFFICE, and FREE-FLOW  )
PACKAGING INTERNATIONAL, INC.,      )

              Defendants.          )
------------------------------------------------------------------------ x

**OPPOSITION TO FREE-FLOW PACKAGING INTERNATIONAL, INC.'S
MOTION FOR JUDGMENT AS A MATTER OF LAW ON DAMAGES**

**INTRODUCTION**

Free-Flow Packaging International, Inc.'s ("FPI") Motion for Judgment as a Matter of Law ("JMOL") on Damages is premature and unfounded, since it assumes that the jury will find all the asserted patents valid and infringed.

Moreover, FPI's JMOL on damages is grounded entirely on the testimony of its damages expert, Donald L. Martin. According to FPI, the jury is obliged to credit Dr. Martin's testimony and that testimony is the only evidence before the jury on the question of a reasonable royalty. (Trial Tr., March 1, 2010 at 2808:18-20; FPI Br., D.I. 294, at 5). FPI is wrong on both counts, for numerous reasons.

First, Dr. Martin's testimony was based on assumptions that are either indisputably inaccurate or, at the very least, the subject of conflicting testimony. For example, Dr. Martin's proposed damage award was premised on the assumption that there exist no viable non-infringing alternatives to the FPI patents, an assumption based on information that he received from FPI

1

and Dr. Kazerooni. But the jury heard substantial evidence that Pregis could easily retrofit its own machines to render them non-infringing at a relatively low one-time cost. Moreover, the jury heard evidence that indisputably establishes the existence of commercially available, unpatented air cushion machines whose existence FPI withheld from Dr. Martin.

Moreover, Dr. Martin's evaluation of a reasonable royalty rate was based on his flawed analysis of intracompany transfer pricing agreements that set a royalty of 11% for use of a large portfolio of air cushion patents (of which the four patents-in-suit are only a small subset) as well as all related know-how, specifications, manufacturing procedures, and test data. PTX 397, at 1. The jury was entitled to conclude that this agreement, to the extent it is probative at all, tends to demonstrate that the royalty rate for the four asserted patents in this case should be substantially less than 10%.

Accordingly, the jury could easily discredit Dr. Martin's testimony as based on inaccurate information provided to him by others and on failing to take into account relevant information.

Second, Dr. Martin acknowledged in his testimony that he did not follow his own analytical framework in determining a reasonable royalty in the present case. He initially testified that the proper approach for determining a reasonable royalty rate is to use three independent methodologies that are then "triangulated" to determine a "baseline rate." Trial Tr., Feb. 23, 2010 at 2302:14-2304:14. But he then admitted that he did not follow that approach in this case, but rather used two methodologies ("Cash Flow Analysis" and "Rule of Thumb Analysis") to bootstrap his third methodology ("Intracompany Licenses") into line with his proposed baseline rate. Trial Tr., Feb. 24, 2010 at 2370:9-2372:4. Since Dr. Martin presented the jury with only one analytical framework for determining a reasonable royalty, and did not provide evidence ap-

plying that analytical framework to the present case, FPI's damages proofs are fatally deficient, and no reasonable jury could award damages on the basis of Dr. Martin's testimony.

FPI has the burden of proof on damages. "[T]he party with the burden of proof is entitled to judgment as a matter of law *only if* it has established its case by testimony that the jury is not at liberty to disbelieve." *Marrero v. Goya of Puerto Rico*, 304 F.3d 7, 22 (1st Cir. 2002) (emphasis added). Here, FPI's evidence of damages is internally inconsistent, based on inaccurate assumptions, and not credible in significant respects. Accordingly, even assuming the jury found the asserted patents valid and infringed, it could easily conclude that FPI's damages, if any, were substantially less than the $6 million to which it claims to be entitled. FPI's Motion for Judgment as a Matter of Law on Damages should therefore be denied. *Winant v. Bostic*, 5 F.3d 767, 774 (4th Cir.1993) ("If . . . reasonable minds could differ as to the conclusion to be drawn from the facts under the applicable law, the court must deny the [Rule 50] motion."). *See also Sales v. Grant*, 158 F.3d 768, 775 (4th Cir. 1998).

## ARGUMENT

### I. THE JURY IS FREE TO DISCREDIT DR. MARTIN'S TESTIMONY

**A. Dr. Martin's Testimony was Based on False Factual Assumptions And Incomplete Information**

It was undisputed that the amount of a reasonable royalty can be no greater than the amount it would cost the accused infringer to adopt a non-infringing, alternative design. As FPI's expert, Dr. Martin, admitted:

> Q. And you would agree with me that no rational person would pay more in licensing fees than what the net present value is of its next best alternative to the license, correct?
>
> A. I would agree with that.
>
> Q. So, really, the next best alternative operates as an upper bound of what a reasonable royalty would be. Do you agree with that?

    A.  That's how you would calculate it, yes.

Trial Tr., Feb. 24, 2010 at 2388:10-18.

    Pregis's expert, Dr. Cornell, testified to the same effect:

    Q.  And, in this case, as I understand it, you say that the outer bounds of such a claim would be measured by what the cost of adopting the next-best alternative to the license would be?

    A.  That's one thing that Dr. Martin and I agreed on.

    Q.  Okay. So that means if the cost of modifying the HC film is X, that cost would put an upper bound on what anybody would pay for a license not to do that, right?

    A.  Yes.

    Q.  And if the cost of moving the knife from point A to point B in the machine is X, that would put an upper bound on the amount someone accused of infringement would place on a license to not do that?

    A.  Yes.

    Q.  Is that fair to say?

    A.  Assuming that moving the knife removes the -- moving the knife removes the infringement.

Trial Tr., Feb. 24, 2010, at 2559:4-20.

    Dr. Martin's estimate of damages was premised on the assumption that Pregis did not have available any low cost, noninfringing alternatives to the subject matter claimed in FPI's patents. That assumption was based on Dr. Kazerooni's testimony that Pregis purportedly had no viable alternatives to the accused designs, so that Pregis's only choices were to take a license or abandon the field altogether. Trial Tr., Feb. 24, 2010 at 2395:12-2396:18. Dr. Kazerooni's testimony on this point was directly contradicted by the testimony of Mr. Wetsch. Accordingly, the jury is entitled to discredit the factual basis of Dr. Martin's assessment of damages. For this reason alone, FPI's JMOL should be denied.

4

Specifically, Dr. Martin relied on information he received from Dr. Kazerooni to the effect that any alternative designs for air cushion machines available to Pregis, including the machines that Dr. Kazerooni identified as V.3A (PTX 192 and DTX 501) and V.3B (DTX 499) (Trial Tr. Feb. 23, 2010 at 2207:3-14), were "in very early stage" and "could not be implemented at customer site." Trial Tr., Feb. 22, 2010 at 1980:25-1981:3. For example, Dr. Kazerooni testified that the modified machines would not be commercially available for one and a half to two years:

> Q. And I believe you said, also, that it would take one and a half to two years before these machines would be commercial. Do you recall that?
>
> A. It would -- it is my opinion those modifications shown were not sufficient, and it would take about a year and a half to two years to come up to a reliable device that can go out. That was my opinion.

Trial Tr., Feb. 23, 2010 at 2209:18-25.

Dr. Kazerooni further testified that implementing alternative machines would require significant labor and cost:

> Q. Okay. To actually implement these retrofits as a commercial product, what actions would be required?
>
> A. Oh, well, the first thing, I would do what is - - that needs to be done is a good development – good research and development at the very beginning stage, to see if this methodology of doing things is actually correct or not. … And then on top of that you need to do field evaluation, or evaluation in the facility, at their facility, or a combination of both. … And then once you're done with that, then you need to bring the machines back to the factory from the customer, you've got to give them a loaner, and then you have to tool up your factory to actually do that implementation. That means you have to make the toolings, you have to have all the required stations to do those processes very quickly and effectively. That's a one-time engineering cost involved in there, tooling the factory. … And then you need to train people to develop those skills, to actually do the modification. And then you do the modification quickly, and then you ship it back to the customer, and you train the customer with the new – new modified device.

5

Trial Tr., Feb. 22, 2010 at 2017:19-2018:12. This testimony of Dr. Kazerooni was directly contradicted by Mr. Wetsch's testimony about an alternative non-infringing design that could be implemented in the field on the accused AirSpeed 5000 machines:

> Q: Do you have a second modification that does not involve cutting it out simply moving the knife?
>
> A: Yes
>
> Q: Can you describe that one?
>
> A. And that one we've done there is just move the knife in front of the sealing section within the same tube and use some of the framework around a – what would be a machine block that attaches on the inside of the machine that then holds the blade and then that just moved that in front of the seal section.
>
> Q. Okay, and was that another one of the machines that Dr. Kazerooni saw and presented here at this trial?
>
> A. Yes.

Trial Tr., Feb. 24, 2010 at 2505:21-2506:8; *see also id*. at 2547:7-10 (testifying that Pregis had non-infringing design options for the AirSpeed SMART machines).

Dr. Kazerooni's testimony that significant labor and costs would be involved in making the alternative machines commercially available was also contradicted by Mr. Wetsch:

> Q: Okay. And then the field retrofit, can you tell what's involved in doing the field retrofit?
>
> A: Well, in that one we he (sic) have to use our service team again which is kind of an important piece of the puzzle, and they would take these components as kits which we do quite frequently, maybe – I wouldn't say frequently, but a couple times of year we have issues with equipment and in that, we would then create a kit with that, you know, right up for the guys to go in the field and make those changes.
>
> Q: Okay, now the field retrofit kit, that just involves moving the knife, do that involve any – you heard testimony here about engineering expense involved in that?
>
> A: Well, you know, opportunistically, you can move into the pegboard solution allows us to do R&D. That's a little more extensive and continue to develop

6

>   the product line. And with that piece of it, you know, total encompassed to do this kind of formatting was probably $50,000 of time and materials.
>
>   Q: Okay. And did this – does this machine require a different user manual than the original?
>
>   A: It doesn't change anything for the operator at all.

Trial Tr., Feb. 24, 2010 at 2506:24-2507:13.

>   Q. And what does that cost, per machine?
>
>   A. Probably on an average of I'd say $500 in total time and materials and maybe 35 minutes of work.

Trial Tr., Feb. 24, 2010 at 2508:22-24.

Mr. Wetsch testified that the alternative machines are presently being used by Pregis's customers, and had been for more than three months (Trial Tr., Feb. 24, 2010 at 2503:12-24; 2504:7-15). Moreover, Mr. Wetsch testified that the accused HC film could be redesigned at a one-time cost of between $100,0000 and $200,000 to avoid the Perkins '397 patent. Trial Tr., Feb 24, 2010 at 2491:14-17; 2522:8-2523:1.

The jury was certainly entitled to credit Mr. Wetsch's testimony over that of Dr. Kazerooni. Moreover, particularly in light of the many inaccuracies in Dr. Kazerooni's testimony, the jury was entitled to reject that testimony in its entirety under the principle of *falsus in uno, falsus in omnibus*.[1] *Lopez-Umanzo v. Gonzales*, 405 F.3d 1049, 1059 (9th Cir. 2005) ("Our law has long recognized that a person who is deemed unbelievable as to one material fact may be disbelieved in all other respects.").

---

[1] Other instances of testimony by Dr. Kazerooni that the jury could conclude were false include his statement that the edge of the film is not, in fact, the edge of the film, but rather is located 7/16ths from the edge of the film (Trial Tr., Feb. 23, 2010 at 2092:7-23), and his statement that film intentionally deflected out of plane by an air cushion machine can be said to follow a planar path. (Trial Tr., Feb. 23, 2010 at 2112:3-24).

7

Additional evidence refuted Dr. Martin's assumptions and was not taken into account by him in formulating his opinions. For example, Dr. Martin was apparently unaware that Storopack had for many years commercialized an unpatented air cushion machine whose design with respect to its inflation, sealing, and slitting components is in the public domain and could be used by any party at zero cost. FPI was certainly aware of this fact, but failed to disclose it to Dr. Martin. For this additional reason, the jury is free to discredit Dr. Martin's assessment of damages.

Moreover, the jury heard other substantial evidence that at all relevant times the overwhelming majority of air cushions were provided using alternatives to the claimed inventions. For example, Dr. Martin conceded that FPI had only a 4% market share in 2002 (and a smaller market share subsequently) (Trial Tr., Feb. 24, 2010 at 2351:9-14), indicating the existence of other market participants offering air cushion machines employing different technology than that claimed by the patents-in-suit. By his own admission, Dr. Martin did not take into account these third-party machines when determining a reasonable royalty rate:

> Q. And do you have any information about any of the other companies that were making air pillows at that time? Let's go over on the other side of this, page 115. It says, other producers of air pillows systems include Automated Packaging System, Free-Flow Packaging International, Fromm Packaging Systems, Polyair Interpack, and STOROpack. And it goes on to mention brand names. Do you have any information about what air pillow activities those companies have in the year 2002, for example?
>
> A. No, I don't.
>
> Q. And, your client didn't furnish you with any information about those companies' activities in the year 2002, did they?
>
> A. Well, I relied on the report. I knew that they -- I did go to websites and I did see the -- I saw information about some of these other companies and I knew that they existed.

8

> Q. So, for all you know, Dr. Martin, in the year 2002, more than 95 percent of the air pillows made and sold in the United States did not use the vaunted technology at issue in this case; isn't that so? For all you know?
>
> A. In 2002?
>
> Q. Yes.
>
> A. That makes perfect sense to me, that that's a possibility, sir. I don't see the relevance of it, but it's certainly a possibility.

Trial Tr., Feb. 24, 2010 at 2353:10-2354:14. For this further reason, the jury is entitled to reject Dr. Martin's assessment of damages.

Dr. Martin's testimony was also based on false information supplied to him by FPI. Dr. Martin assumed that FPI had never licensed the technology in question when, in fact, FPI had given a royalty-free license under U.S. Patent No. 6,582,800 to Storopack (PTX 352; Trial Tr., Feb. 23, 2010 at 2273:18-22; Trial Tr. Feb. 24, 2010 at 2356:18-2357:3; 2363:10-14). Consequently, Dr. Martin did not take into consideration the existence of this royalty-free license in determining the reasonable royalty rate (Trial Tr., Feb. 23, 2010 at 2273:9-25). Dr. Martin's analysis was further flawed because he was prevented by FPI from considering other factors relevant to determining the reasonable royalty. For example, FPI never told Dr. Martin about the earlier Fuss and Perkins patents (Trial Tr., Feb. 24, 2010 at 2360:1-2361:5). FPI also never told Dr. Martin about the NOVUS line of products that began competing with the EZ CELL-O line in 2004 (coincident with the decline in EZ CELL-O film sales) (Trial Tr., Feb. 24, 2010 at 2373:25). Nor did FPI tell Dr. Martin about the patents on film materials run through EZ CELL-O machines that FPI's President, Mr. Nezwek, testified about (Trial Tr., Feb. 24, 2010 at 2398:20-2399:9). This provides yet additional grounds on which the jury is entitled to reject Dr. Martin's assessment of damages.

In addition, Dr. Martin's analysis assumed that the four patent-in-suit would have been licensed as a package in a hypothetical negotiation conducted on February 21, 2008. *See* Trial Tr., Feb. 23, 2010 at 2267:12-2268:23. However, that assumption is fatally flawed, since at that time, two of the four patents-in-suit did not even exist. Trial Tr., Feb. 24, 2010 at 2397:14-2398:10. Moreover, Dr. Martin did not attempt to apportion his reasonable royalty figures amongst the individual patents-in-suit. For this additional reason, the jury is entitled to reject Dr. Martin's assessment of damages.

Dr. Martin's testimony was also based on a flawed and inaccurate evaluation of an intra-company license between FPI and its foreign affiliates. Dr. Martin relied on an intra-company license (PTX 79) that included among other things, marketing knowledge and information, sales information, manufacturing procedures, training, and all improvements and developments in film and manufacturing technology, yet he made no attempt to attribute value to the four patents-in-suit as distinct from other technologies identified in the intra-company license:

> Q. So, there could be 30 other patents involved in the making and use of that equipment, and that's not taken into account by you?
>
> A. The – the – that patents in suit are the – I was asked to calculate what the damages were associated with – with the infringement of those patents in suit. And if that involved related technology that was – that was stated in the patents and would be stated in the licenses, then that would included that, as well.

Trial Tr., Feb. 24, 2010 at 2399:10-18.

Nor did Dr. Martin distinguish in his damages analysis between February and June 2008 when only two patents-in-suit had issued and May of 2009 when the additional patents-in-suit had issued:

> Q. And, you don't distinguish in your damages analysis between the time period between February and June 2008 and the time the two of the patents being asserted in this case were issued, did you?

> A. Well, I don't – I don't distinguish them in terms of the – the dates when they were done – when they were issued, because I didn't rely on their issuance as much as the applications and the knowledge on the part of Pregis of their existence.
>
> Q. And so, your hypothetical negotiation involves an agreement to pay royalties on account of patents that are not to issue for more than a year in the future?
>
> A. Because the applications were there and they – and it was the case that the – the communications to Pregis involved not just the fact that they were patents that were issued, but that also they were applications of patents, and there were more – there were more patents to come.

Trial Tr., Feb. 24, 2010 at 2397:18-2398:10.

Dr. Martin also had no explanation for why the EZ I machine was excluded from the intra-company license:

> Q. Do you know why there is no reference to the CELL-O EZ I air cushion machine in the license agreement, Professor?
>
> A. Well, it's related products. It's related technology and related products.
>
> Q. Do you know why there's no –
>
> A. So I don't have a specific knowledge about why the CELL-O I isn't specified.

Trial Tr., Feb. 24, 2010 at 2376:6-13.

In light of this testimony, a reasonable jury is fully entitled to discredit Dr. Martin's testimony as to his reasonable royalty calculation. Thus, the record is flush with evidence that Dr. Martin's opinions were based on false and inaccurate assumptions and incomplete information. For this reason, the jury is to reject Dr. Martin's testimony and FPI's JMOL on damages should be denied.

### B. Dr. Martin Failed to Apply His Own Analytical Framework

FPI's JMOL on damages should be denied for the separate and additional reason that Dr. Martin failed to follow his own analytical framework for determining reasonable royalty damages in this case. Dr. Martin testified that his analytical method required an evaluation of three

11

independent "methodologies" that are "triangulated" to determine a "baseline rate" to which the Georgia-Pacific factors are then applied. As Dr. Martin testified:

> Q. Can you tell me what the factors 14 and 15 are?
>
> A. Yes. This is -- in particular where they – the expert does independent -- independent analysis outside of the 13 Georgia-Pacific factors that we just discussed. We're going to apply those Georgia-Pacific factors. They're directional factors. We're going to apply them to some baseline rate.
>
> And the only thing we haven't done so far is to give you -- or determine what the baseline rate is that you can apply these factors to, and in order to come up with a reasonable royalty rate, which is what the Georgia-Pacific factors direct you to do.
>
> So, the -- the -- my second bullet here is adopting three different approaches of these three different methodologies, to come up with the baseline. Think of it as triangulating on a number or a range of numbers that represents the baseline rate, from which we can then adjust -- that we can adjust, depending on the influence of those Georgia-Pacific factors.
>
> Q. What do you mean by "triangulation"?
>
> A. Well, there is a lot of information from different sources that are – that's relevant, but not -- but difficult to distill into one number, yet, either really – it's all very useful information. There's financial information from Pregis.
>
> There's – there's actual negotiated arm's-length royalty rates from FPI, and there's also other information that -- that represents -- that you can use to come up with -- to apply a rule of thumb to what the royalty rate starting point might be.
>
> And, so I'm triangulating by using these three different types of information. And I'll come up with three different numbers -- three numbers that will be all in the same range.
>
> Now, they don't have to be in the same range.
>
> And that's part of the test, and why you want to triangulate. If you want to rely just on one methodology, you may give up information that would influence you in another way.
>
> So, by using three -- these three methodologies, you can pretty much see whether you're on target for a starting point rate with -- royalty rate within reason.
>
> And that's my approach.

Trial Tr., Feb. 23, 2010 at 2302:18-2304:10.

Dr. Martin identified the three methodologies that he used to perform his triangulation as: "Intracompany Licenses," "Cash Flow Analysis," and "Rule of Thumb Analysis," as shown in the demonstrative used by Dr. Martin during his direct testimony:

**Methods for Calculating Baseline Rates**

| Methodology | Baseline Rates |
| --- | --- |
| Intracompany Licenses | 11% - 13% |
| Cash Flow Analysis | 10.9% |
| Rule of Thumb Analysis | 9.9% - 13.2% |

DTX 434, Page 18

Remarkably, however, on cross-examination Dr. Martin acknowledged that he had not applied his own analytical framework in determining the reasonable royalty in this case. As the cross-examination made clear, he was unable to rely on the "Intracompany Licenses" methodology to determine an independent data point for use in triangulating the baseline rate because he could not independently determine from the intracompany licenses he examined what portion of the license fee was attributable to the patents-in-suit as opposed to other intellectual property rights covered by those agreements. He was therefore left with no choice but to use his other two methodologies to "bootstrap" a baseline rate for the "Intracompany Licenses" methodology:

> Q. And, what – what portion of the license did consideration did you attribute to the confidential information, Dr. Martin?
>
> A. Well, in a – in a very broad sense, not very – not a very large portion of the –

> Q. Well, what portion?
>
> A. I don't have a specific percentage?
>
> Q. Do you have a rough percentage?
>
> A. No, I don't have a – well, I would say that, I would say that it was just not a significant portion of the -- of the total license.
>
> Q. How do you know?
>
> A. Well, because the – one of the benefits of using the approach that I used to – to determining what the range of starting point might be, was to use this three-pronged approach that I've been talking about. And, what was interesting about that approach was that the other two approaches yielded royalty rates that were very close to the royalty rates that – that the intracompany licenses had. … The – those other – those other approaches had relatively – had royalty rates that were very close to the range of royalty rates in these license. So, I took it to mean that the terms like "confidentiality" and "training" and et cetera couldn't represent a large portion of – of these intracompany licenses, but rather the technology aspect must have been the one that presented a very large portion, because those numbers were very close to the approaches that I used that didn't rely on terms of intracompany licenses at all.

Trial Tr., Feb. 24, 2010 at 2370:9-2372:4.

Pregis's damages expert, Dr. Bradford Cornell, highlighted this flaw in Dr. Martin's analysis:

> Q. Okay. Now, have you looked at the analysis that was done by Dr. Martin in this case?
>
> A. Yes. I looked at the three approaches that he used for computing the royalty.
>
> Q. And can you comment on those, on his analysis.
>
> A. Well, let's take them one at a time.
>
> Q. Okay, please do.
>
> A. The first was a license approach.
>
> Q. Yeah.
>
> A. And the license approach involved looking at some licenses between FPI and its affiliates. The problem is that those license agreements have a big laundry list of things. And if you're asking what the value of the infringing technol-

14

> ogy is, you've got to separate that from the rest of the laundry list. And my criticism was he simply did not do that.
>
> Now, here as I listened to the testimony on cross, he said, well, all the other laundry list wasn't worth very much. And you asked him how he knew that. And he said, by looking at the other approaches, because the three wouldn't have been consistent if I didn't assume that the rest of the laundry list was zero. But that's a big no-no. When you're using three independent approaches, they have to be independent. You can't say they're all consistent because when I adjust number 1 to be consistent with number 2 and 3, it's consistent. That doesn't – that's not the way you proceed.
>
> So he would have to look at that laundry list and value it. I don't see him having done that.

Trial Tr., Feb. 24, 2010, at 2554:22-2555:25.

By definition, an analytical approach that uses "triangulation" to determine a baseline royalty rate cannot be employed where only two independent data points are available. The lack of a third independent data point is a fatal defect in FPI's damages proofs because it means that there is no evidence in the record from which a jury could reasonably determine a baseline royalty rate, a necessary step in the analysis according to Dr. Martin. Accordingly, the jury is entitled to reject Dr. Martin's evaluation of damages and FPI's JMOL on damages should be denied. Indeed, since FPI has the burden of proof on damages (*see ResQNet.com, Inc. v. Lansa, Inc.*, 594 F.3d 860, 872 (Fed. Cir. 2010)), and since it has failed to adduce competent evidence from which the jury could determine a baseline royalty rate, FPI's claim for damages fails for lack of proof.

## II. FPI'S MOTION MISCHARACTERIZES DR. CORNELL'S TESTIMONY

In its JMOL on damages, FPI mischaracterizes the testimony of Pregis's damages expert, Dr. Cornell, as a basis for FPI's unfounded assertion that he "offered only defective testimony … suggesting that the amount of damages in this case would be zero." (FPI Br., D.I. 294, at 2). In

15

fact, what Dr. Cornell actually said was <u>if</u> the cost of the next-best alternative (or switching designs) is negligible, <u>then</u> a reasonable royalty would be zero:

> Q. Now, Dr. Cornell, didn't you in your expert report that you prepared in this case state . . .
>
> Q. If the firm could have designed around the patented technology at negligible cost, it would be able to supply the non-infringing product to its customers, then a reasonable royalty would be zero?
>
> That's what you wrote, isn't it, Doctor?
>
> A. What I wrote there is an exact logical statement, yes. If the costs are negligible, then the reasonable royalty would be zero.

Trial Tr., February 24, 2010, at 2561:14-2562:5.

> Q. So, isn't this contrary to Georgia-Pacific saying that the reasonable royalty should be zero?
>
> A. Not if there's a costless design-around, no. If you have a costless alternative, you could just go to tomorrow. Then in the -- in the negotiation you would have said to the person with the license, okay, if you say I can't do that, I'll do this. If I can print on red or white paper and all I have to do is put the color in, the design-around cost would be zero. You wouldn't pay any royalty.

Trial Tr., February 24, 2010, at 2563:3-12.

> Q. Now, in addition to saying in your expert report that reasonable royalty would be zero --
>
> A. I didn't say that. I put a logical syllogism in my report that if the design-around was negligible, then it would be zero.

Trial Tr., February 24, 2010, at 2568:1-5.

FPI also incorrectly asserts that Dr. Cornell "did not do *any* analysis following the established Georgia-Pacific factors" (FPI Br. at 2). On the contrary, Dr. Cornell's testimony took into account the next-best alternative for Pregis, one of the Georgia-Pacific factors. For example, Dr. Cornell testified that the Georgia-Pacific factors are limited by the next best alternative:

> Q. Okay. Now, in the context of valuing patented -- claimed inventions in patents, can you explain how the Georgia-Pacific factors relate to the concept of next-best alternative?

16

> A. Here's the way I understand that. Let me do it -- let me give you a specific example.
>
> Suppose that I'm making a product and I'm making a thousand dollars profit on that product and I'm using a technology which is alleged to infringe. And then I ask myself, if I switch from using that technology to the next-best alternative that I have, presumably the next-best alternative is more expensive or I would have used it to begin with. So let's say that my profit falls to $975 when I use my next-best alternative.
>
> That means there's a $25 gap, that I'm going to lose $25 by going to the next-best alternative, and I'd be willing to share that with someone in the form of a license. So there's $25 to be negotiated between the licensor and the licensee. The Georgia-Pacific factors help determine where within that $25 range a hypothetical negotiation would end up.

Trial Tr., February 24, 2010, 2553:5-25.

In reality, as noted above, both parties' experts agreed that the cost of the next best alternative sets an upper bound to a reasonable royalty. The jury heard evidence from Mr. Wetsch that the approximate cost to retrofit an AirSpeed 5000 would be $500 per machine (Trial Tr., Feb. 24, 2010 at 2508:17-24). With approximately 2,000 machines in the field (*id*. at 2508:25-2509:2), the retrofit of the machines would cost $1 million. Moreover, the jury heard testimony that modifying the HC film would entail a one-time cost of between $ 100,000 and $200,000. Trial Tr. Feb 24, 2010 at 2491:14-17; 2522:8-2523:1. Given the testimony, by both sides' experts, that the next best alternative operates as an upper bound of what a reasonably royalty would be, the jury could conclude that – assuming all of FPI's patents-in-suit were found valid and infringed - a reasonable royalty for the AirSpeed 5000 machines and HC film could not, at an absolute maximum, exceed a one-time payment of $1.2 million and that in a hypothetical negotiation between the parties, this sum would be apportioned between the parties in accordance with the *Georgia Pacific* factors.

## CONCLUSION

For the reasons set forth above, FPI's Motion for Judgment as a Matter of Law on Damages should be denied.

Dated: March 12, 2010

                FRIED, FRANK, HARRIS, SHRIVER
                  & JACOBSON LLP


                By:   /s/   Tommy P. Beaudreau
                    Tommy P. Beaudreau (VA Bar # 41272)

                1001 Pennsylvania Avenue N.W.
                Suite 800
                Washington, D.C.  20004-2505
                Telephone:  (202) 639-7000
                Facsimile:  (202) 639-7003
                Email:  tommy.beaudreau@friedfrank.com

                James W. Dabney
                Henry C. Lebowitz
                Stephen S. Rabinowitz

                One New York Plaza
                New York, NY 10004-1980
                Telephone:  (212) 859-8000
                Facsimile:  (212) 859-4000

                Attorneys for Plaintiff
                Pregis Corporation

7625125

## CERTIFICATE OF SERVICE

     I hereby certify that on the 12th day of March, 2010, I will electronically file the foregoing Opposition to Free-Flow Packaging International, Inc.'s Motion for Judgment as a Matter of Law on Damages with the Clerk of Court using the CM/ECF system, which will then send a notification of such filing (NEF) to the following:

Bradley Charles Wright
Banner & Witcoff Ltd. (DC)
1100 13th St NW
Suite 1200
Washington, DC 20005-4051
(202) 824-3000
Email: bwright@bannerwitcoff.com

Attorney for Defendant
*Free-Flow Packaging International, Inc. a Delaware Corporation*

                                        By:  /s/  Tommy P. Beaudreau
                                            Tommy P. Beaudreau (VA Bar # 41272)

                                        Attorneys for Plaintiff Pregis Corporation
                                        FRIED, FRANK, HARRIS, SHRIVER &
                                        JACOBSON LLP
                                        1001 Pennsylvania Avenue N.W.
                                        Washington, D.C. 20004-2505
                                        Phone: (202) 639-7000
                                        Facsimile: (202) 639-7003
                                        tommy.beaudreau@friedfrank.com